**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| REMBRANDT ENTERPRISES, INC., | | |
| Plaintiff, | | No. C15-4248-LTS |
| vs. | | |
| DAHMES STAINLESS, INC., | | **ORDER ON MOTIONS FOR** |
| Defendant. | | **SUMMARY JUDGMENT** |

———————————

## I.    INTRODUCTION

Presently before me are cross motions for summary judgment.    Doc. Nos. 53 and 54.    The motions are fully submitted and I find that no oral argument is necessary.

## II.    HISTORY

Plaintiff Rembrandt Enterprises, Inc. (Rembrandt), a large scale producer of eggs, filed this action on December 9, 2015.   Doc. No. 1.    Rembrandt primarily requests declaratory relief regarding its purchase contract with defendant Dahmes Stainless, Inc. (Dahmes).    Rembrandt also requests restitution and an accounting of Dahmes' expenses. *Id.*, at 4.

Dahmes, a manufacturer of industrial products, filed its answer on April 1, 2016. Doc. No. 14.    Dahmes also filed a counterclaim against Rembrandt, alleging two counts of breach of contract.[1]    Doc. No. 14 at 12-15.    Dahmes also filed a motion to strike a portion of the complaint, arguing that it contained a description of an offer to

---

[1] This case contains claims and counterclaims, so the parties are both plaintiff and defendant. For clarities sake, Rembrandt will be referred to as the plaintiff and Dahmes will be referred to as the defendant.

compromise.   Doc. No. 16.   The Honorable C.J. Williams, Chief United States Magistrate Judge, found it appropriate to seal the relevant documents rather than striking them.   Doc. No. 29.   Dahmes then filed a supplemental answer.   Doc. No. 31.   The parties also stipulated to a protective order.   Doc. No. 17.

The parties filed cross motions for summary judgment on March 3, 2017.   Doc. Nos. 53 and 54.   Rembrandt filed a resistance to Dahmes' motion for summary judgment on April 7, 2017.   Doc. No. 69.   On that same date, Dahmes filed a resistance to Rembrandt's motion for summary judgment.   Doc. No. 70.   Each party then filed reply materials.   Doc. Nos. 71, 72, 73.

Throughout the pendency of the case, the parties have engaged in numerous discovery disputes (*See* Doc. Nos. 40, 49) and several disputes regarding the sealed information (*See* Doc. No. 66).

## III.   FINDINGS OF FACT

As noted above, Rembrandt is a large scale producer of eggs and egg products, with several different facilities in Iowa and Minnesota.   In approximately 2014, Rembrandt sought to expand its business and provide egg products to cereal producer Kellogg.[2]   The exact details regarding Rembrandt's and Kellogg's relationship are disputed.   In short, Rembrandt alleges it had assurances that it could become Kellogg's sole egg product supplier because Kellogg's relationship with its past supplier had soured. Dahmes posits that Rembrandt was merely hoping that if it substantially increased its

---

[2] A background piece of information assumed in the various filings without being specifically articulated is that three major cereal manufacturers in America are General Mills, Post and Kellogg.   All three are alluded to in the filings, as at the time of the events giving rise to this case, Rembrandt provided egg products to General Mills, and, as explained more below, hoped to begin selling more egg products to Kellogg because a competing egg supplier had been recently purchased by Kellogg's rival Post.

output capacity it could secure a larger share of Kellogg's business. Regardless, it is undisputed that Rembrandt took steps to comply with Kellogg's corporate requirements and to become a more significant supplier for Kellogg. Rembrandt began the undertakings necessary to build a new egg processing plant near an existing facility in Thompson, Iowa. Rembrandt's plan for the new site was for a large scale facility, with a construction budget of over $100 million dollars.

As part of the new and expanded Thompson facility, Rembrandt entered into an agreement (Doc. No. 53-3 at 18) with Dahmes for an industrial egg dryer.[3] Rembrandt and Dahmes signed the purchase agreement on November 20, 2014. The purchase price was $8.5 million dollars, subject to adjustment for change orders. Following subsequent change orders, the actual price turned out to be $8.99 million. A down payment of $2.5 million was due at signing and additional progress payments were scheduled throughout the contract term.

Per its terms, the agreement is governed by Minnesota law. It required Dahmes to install the dryer with an initial completion date of December 1, 2015, and a final operation-ready completion date of January 1, 2016. Rembrandt contends those dates were included in the agreement to allow it to begin its proposed relationship with Kellogg. Dahmes states that it was largely unaware of why Rembrandt was building a new facility or how it was financing the project.

The agreement contained financial penalties for missed deadlines. The agreement also contained several confidentiality requirements that have been previously discussed in the course of this case. Because of the scale of the project, Dahmes was required to coordinate installation with the Rembrandt's general contractor. Rembrandt broke ground on its Thompson facility in the fall of 2014. The parties dispute whether the

---

[3] The dryer at issue in this case is for drying the food product portion of the egg. Specifically, the dryer is meant to help produce dried egg yolks.

specific location of the dryer's installation was necessarily included in the agreement (i.e., was the agreement to provide a dryer for the Thompson facility or was the agreement to provide a dryer that Rembrandt merely intended to have installed at the Thompson facility).

Highly Pathogenic Avian Influenza (Avian Flu) is an aggressive illness fatal to domestic poultry. In the spring of 2015, an epidemic of Avian Flu hit the Midwestern United States. The outbreak was notorious and engendered a large amount of media coverage and government intervention. While six Rembrandt facilities were affected by the Avian Flu, the Thompson facility was not. Ultimately, Rembrandt was forced to eliminate over a million birds, which cut its production capacity by over 50%.

The causes of the Avian Flu outbreak are disputed. Rembrandt asserts that it took appropriate precautionary measures to avoid the outbreak and spread of an Avian Flu type illness. Dahmes contends that Rembrandt increased its risk by having an "in-line" production model in which eggs are hatched, raised, and processed in the same location. Dahmes posits that if these operations were kept separate, the impact of an Avian Flu outbreak could have been limited.

As a result of its lost capacity, Rembrandt declared a force majeure to its buyers and began distributing eggs and egg products on a pro rata basis. Rembrandt also limited access to its Thompson facility to reduce the risk of an Avian Flu infection. Egg prices went up and Rembrandt lost its opportunity to supply eggs to Kellogg at the quantities that Rembrandt had hoped.[4] Rembrandt contends it lost other business and profits as a result of the Avian Flu outbreak and the market repercussions the outbreak caused. Dahmes contends that Rembrandt's problems were partly self-inflicted, such as

---

[4] Rembrandt had hoped to sell Kellogg 63 million pounds of egg product to Kellogg in 2016. Instead, Kellogg is expected to order 20 million pounds of egg product per year from Rembrandt by 2018.

4

being unable to provide cage-free eggs requested by one of its biggest customers, General Mills. Dahmes argues that Rembrandt had already missed opportunities with Kellogg prior to the Avian Flu outbreak and that Rembrandt had failed to achieve its objectives with Kellogg as early as late 2014. Finally, Dahmes contends that Rembrandt was largely compensated for the damages from the Avian Flu outbreak by insurance and government payments.

In May 2015, Rembrandt told its contractors, including Dahmes, of a temporary halt on the new Thompson facility. The parties agree that on October 22, 2015, Rembrandt informed Dahmes that the expansion was not happening. Dahmes told Rembrandt that this constituted a breach of contract. In January 2016, Rembrandt's board voted to formally scuttle the construction project and write off the costs occurred. Rembrandt's exact financial situation at the time, along with the reason the board decided to scuttle the project, are disputed by the parties.

Prior to the alleged breach, Rembrandt had paid Dahmes $4.31 million, although it appears that $546,000 was subsequently returned to Rembrandt per the parties' agreement. Dahmes presented Rembrandt with a one page accounting summary of its alleged damages, which purported to itemize claims for lost profits of $2.4 million, $329,000 in alleged costs incurred for suspending work in process, and actual expenses allegedly incurred of $992,000.

Other relevant facts are discussed below.


IV.     SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving

party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine

and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane*, Federal Practice and Procedure* § 2720 (3d ed. 1998). When the parties seek summary judgment on some of the same issues, I may consider all the parties' arguments as to each issue, keeping in mind the separate inferences that are to be drawn from each motion. *See Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005).

## V.     ANALYSIS

In its motion for summary judgment, Rembrandt makes three arguments. First, that it is entitled to summary judgment on its declaratory judgment claim based on the doctrine of frustration of purpose. Second, Rembrandt is entitled to summary judgment

on Dahmes' breach of contract counterclaim. Finally, Rembrandt argues that it is entitled to summary judgment on Dahmes' counterclaim for lost profits.

Dahmes requests that the court "enter an Order in Dahmes' favor granting Dahmes' Motion for Summary Judgment and dismissing Rembrandt's Complaint. . ." Doc. No. 54 at 2. Dahmes then goes onto request a trial on the issue of its damages. Accordingly, then, it seems Dahmes is requesting summary judgment on Rembrandt's declaratory judgment claim and in favor of its breach of contract counterclaim.

## A.    *Breach of Contract*

At the outset, the parties agree that they entered into a contract and that Rembrandt breached that contract. Their dispute is whether the breach is excusable. As noted above, when considering cross motions for summary judgment, I must consider the issues individually to preserve the proper deference to the non-moving party. In this instance, the parties raise wholly separate rationales in support of their respective motions. Accordingly, I will consider the motions separately.

### 1.    *Frustration of Purpose*

#### a.    *Rembrandt's Argument*

Rembrandt's motion for summary judgment is rooted in the doctrine of frustration of purpose. As set out in Rembrandt's brief:

> The defense of frustration of purpose applies where: (1) The party's principal purpose in making the contract is frustrated; (2) without that party's fault; (3) by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made. *City of Savage v. Formanek*, 459 N.W.2d 173, 176 (Minn. Ct. App. 1990) (internal citation omitted).
>
> Because all three elements are indisputably present, Rembrandt is entitled to judgment as a matter of law on its declaratory judgment claim

that it was entitled to terminate the Agreement, and on Dahmes'
counterclaim that Rembrandt terminated the Agreement without cause.

Doc. No. 53-1 at 14.

Rembrandt states that the principal purpose of the agreement with Dahmes was to
"supply equipment for the egg processing facility under construction at Rembrandt's
location in Thompson, Iowa." *Id*. Rembrandt then makes its argument regarding each
frustration of purpose element. Regarding the purpose of the contract, Rembrandt
argues:

> The principal purpose of the contract "[m]ust be so completely the
> basis of the contract that, as both parties understand, without it the
> transaction would make little sense." *City of Savage*, 459 N.W.2d at 176
> (quoting Restatement (Second) of Contracts § 265 cmt. a (1981)).
> However, it is only the purpose of the party seeking to be excused from the
> contract that must be frustrated for the doctrine to apply. *Little Canada
> Charity Bingo Hall Ass'n v. Movers Warehouse, Inc.*, 498 N.W.2d 22, 25
> (Minn. Ct. App. 1993). In other words, the lynchpin is Rembrandt's
> purpose, not Dahmes' purpose. In determining the principal purpose of a
> contract, a court may consider both extrinsic evidence and the surrounding
> circumstances. *Pieper, Inc. v. Land O'Lakes Farmland Feed, LLC*, 390
> F.3d 1062, 1066 (8th Cir. 2004). . .
>
> Rembrandt's principal purpose is expressly stated in Article I of the
> Agreement: to obtain a yellow egg dryer that will be "install[ed] . . . at
> Rembrandt's location in Thompson, Iowa" where Rembrandt was building
> a new egg processing plant. (SOF ¶ 19.) The Agreement's requirement
> that the dryer be "fully installed" and "produc[ing] saleable and acceptable
> product . . . no later than January 1, 2016" provides further evidence of
> this specific purpose, since the deadline was necessary for Rembrandt to
> begin processing Kellogg's dried egg volume at the Thompson facility.
> (SOF ¶ 20.) . . .
>
> In [*City of Savage v. Formanek*, 459 N.W.2d 173, 176 (Minn. Ct. App.
> 1990)] the Minnesota Court of Appeals held that the principal purpose of
> the defendant landowners in entering an assessment agreement with the City
> of Savage to lay sewer lines was to "enable industrial development" on their

property. 459 N.W.2d at 176. The court found this to be the principal purpose based on the fact that the landowners "would have little use for sewer and water on a parcel of land they have held for 31 years if they could not sell or develop it." *Id*. at 176. Here, it is undisputed that Rembrandt had no use for a dryer capable of drying over 12,000 pounds of whole eggs per hour unless it was installed in a facility capable of producing and processing such an enormous volume of liquid eggs. (SOF ¶ 16.) Consequently, without the planned Thompson facility to make use of the yellow dryer, the Agreement "would make little sense." *See Formanek*, 459 N.W.2d at 176.

*Id*. at 14-16.

Regarding frustration, Rembrandt argues that its purpose was thwarted by the Avian Flu outbreak:

Under Minnesota law, a party's principal purpose is frustrated when a change in circumstances leaves it with "no commercial reason" to follow through on the agreement. *Pieper*, 390 F.3d at 1066; accord *Formanek*, 459 N.W.2d at 166 (rejecting argument that the purpose of the contract must become impossible to constitute frustration). In this case, it did become impossible for Rembrandt to achieve its principal purpose in entering the Agreement––obtaining a large yellow dryer for the new Thompson facility––because the 2015 HPAI outbreak forced Rembrandt to terminate construction of the Thompson facility. The changes wrought by HPAI made a new factory unjustifiable, making it unlikely it could ever open its doors even if was built. . .

There was no point in continuing construction, however, because HPAI had caused such a massive drop in demand for dried egg products that the new facility would likely never have opened its doors. (SOF ¶ 56.) Nor would Rembrandt's lenders have permitted such capital expenditures by Rembrandt; they slashed Rembrandt's capital expenditure budget from $365 million over five years to no more than $35 million in 2016 and $20 million annually thereafter. (SOF ¶ 58.)

The cancellation of the Thompson facility project, which frustrated Rembrandt's principal purpose of obtaining a dryer for the facility, is similar to the frustration in both *Orix* and *Formanek*.

10

*Id*. at 16-17.

Regarding the second element, Rembrandt argues that "a party is not at fault for the frustration of a contract's principal purpose if it did not cause the frustrating event. *See Formanek*, 459 N.W.2d at 177." *Id*. at 18. Rembrandt states that the Avian Flu outbreak frustrated its ability to build the Thompson facility and that the outbreak was outside its control.

Regarding the third element, Rembrandt argues:

> The same facts that prove that Rembrandt's principal purpose in entering the Agreement was to supply a yellow dryer for the Thompson facility also prove that both parties assumed that the Thompson processing facility would be constructed to make use of the dryer. There is simply nothing in the Agreement, or elsewhere in the record, to indicate that either party contemplated that Rembrandt needed this enormous dryer for anything other than the new Thompson processing facility.

*Id*. at 18.

### b. *Dahmes' Response*

Dahmes argues that summary judgment is not appropriate because of a multitude of disputed facts, including:

> (1) Whether the parties shared the same understanding of purpose about the Agreement.

> (2) Whether Rembrandt's fault contributed to the unviability of the Thompson facility by failing to secure any customer supply contracts, to justify an expansion.

> (3) Whether Rembrandt actually "lost" its Facility K Funding, and if it did whether Rembrandt could have secured alternative funding for the Thompson facility.

> (4) Whether Rembrandt suffered as great of a financial loss as claimed.

11

(5) Whether Rembrandt's decision to proceed with dried egg production expansion (including the CWS dryer) shows that the purpose of the Agreement was frustrated[.]

(6) Whether Rembrandt properly prepared for the impact of HPAI or its biosecurity policy contemplated an outbreak of HPAI or something of similar magnitude.

(7) Whether Rembrandt failed to allocate for this risk in its agreement with Dahmes by not including contingencies relating to its funding sources, avian disease or obtaining long-term supply contracts from customers.

(8) Whether Rembrandt could have used or sold the Dahmes dryer.

Doc. No. 70 at 15.

Dahmes also argues that Rembrandt's frustration of purpose argument fails because the parties did not have a shared purpose in the agreement.

> Rembrandt relies on a stilted interpretation of *Little Canada Charity Bingo Hall Ass'n v. Movers Warehouse, Inc.*, to claim that only Rembrandt's purpose must be considered. 498 N.W.2d 22, 25 (Minn. Ct. App. 1993). . . The law is clear: the relevant "purpose" must be understood by both parties.
>
> To establish a contract's principal purpose, a party must prove that a particular purpose was "so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *See In re Acceptance Ins. Cos. Inc.*, 567 F.3d 369, 382 (8th Cir. 2009) (quoting Rest. (2d) of Contracts § 265 cmt. a) (emphasis added). If the principal purpose is not understood by both parties, then the frustration of purpose defense fails as a matter of law. Id. . .
>
> [F]or Rembrandt to prevail the parties must have a shared understanding of the underlying purpose of the contract. *See In re Acceptance Ins. Cos. Inc.*, 567 F.3d at 382. The Agreement provides the parties' purpose as follows: "Rembrandt has agreed to purchase, and Dahmes has agreed to sell and install, a Dahmes Ductless Dryer System designed to and which will achieve 9,000 pounds of water evaporation per hour." Pltf.'s SOF 15, D-App. 203. Nowhere does the Agreement

12

incorporate any reference to Rembrandt's business strategy to build a $100 million new processing facility – let alone declare it the "purpose" of the Agreement. *Id*. On the contrary, Rembrandt went to great lengths to hide its business strategy from Dahmes. SOUF 31, D-App. 137, D-App. 266-68.

*Id*. at 4-5.

Next, Dahmes argues that the cases Rembrandt cited in support of its frustration of purpose argument are factually distinct. Regarding *Formanek*, 459 N.W.2d at 177, Dahmes points out that it involved a post-trial appeal, not a motion for summary judgment. Dahmes argues that because of the procedural posture of that case and the distinct facts, which involved a governmental property assessment, the *Formanek* holding is not applicable here. Moreover, Dahmes argues that in *Formanek*, the parties agreed on a shared purpose for the breached contract.

Similarly, Dahmes argues that *Orix Pub. Fin., LLC v. Lake Cty., Minn.*, Civil No. 11–3261, 2013 WL 6328865, at *12 (D. Minn. Dec. 5, 2013), referenced above, is another government-related property dispute that is distinct from this case because both parties in that case understood the purpose of the agreement. Regarding *Pieper*, also referenced above, Dahmes argues:

Rembrandt misapplies *Pieper, Inc. v. Land O'Lakes*, 390 F.3d 1062 (8th Cir. 2004). In *Pieper, Inc., Land O'Lakes* ("LOLFF") agreed to purchase weaner pigs from Pieper and sell them to third-party finishers. Farmland would then buy the market hogs from the third-party finishers under the terms of an existing contract between Farmland and Pieper. When Farmland stopped purchasing market hogs from the third parties, LOLFF informed Pieper that it was no longer obligated to purchase weaner pigs from Pieper. The Court found in favor of LOLFF's frustration of purpose defense because the express purpose of the agreement, supplying hogs to Farmland, was frustrated by Farmland's refusal to purchase market hogs. Critically, the agreement expressly referenced the need for third-party involvement, "LOLFF was to buy Pieper's weaner pigs only while Farmland purchased market hogs from third-party finishers." *Id*. at 1066 (emphasis added). Both parties conceded that "the deal was dependent

13

upon [third-party finishers] being able to sell the market hogs to Farmland."
*Id*.

Doc. No. 70 at 7.

Finally, Dahmes makes factual arguments about the actual purpose of the contract and contends that even if that purpose was frustrated, Rembrandt was not faultless.

### c.    *Analysis*

As noted above, the parties agree on Minnesota's three-element test for the frustration of purpose doctrine: (1) the party's principal purpose in making the contract is frustrated; (2) without that party's fault; and (3) by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made.    The parties agree about virtually nothing else.

Perhaps the most important dispute concerns the purpose of the agreement.    In *Formanek*, the Minnesota Court of Appeals stated:

> The purpose that is frustrated must have been a principal purpose of the party claiming discharge.    The principal purpose: [M]ust be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense.    Restatement (Second) of Contracts § 265, comment a (1981).    Here, both parties understood the principal purpose of the agreement was to enable industrial development. . .

*Formanek*, 459 N.W.2d at 176.    Both parties seize on portions of this quote to make their arguments.    Rembrandt is correct that the party claiming discharge (Rembrandt) is the holder of the purpose that must be frustrated.    Put another way, Dahmes cannot claim discharge of the contract based on frustration of purpose if the only purpose that was frustrated was Rembrandt's.

However, even though Rembrandt's is the relevant purpose, Dahmes is correct that Rembrandt fails to consider the next portion of the *Formanek* quotation, wherein the court explained that the purpose claimed by party seeking discharge (Rembrandt) must

14

be so basic and obvious that both parties understand it. Thus, the proper reading of *Formanek* is that only the party whose purpose was frustrated may claim frustration of purpose, but the purpose allegedly frustrated must be so basic that both parties to the agreement understood it.

Dahmes argues the agreement was a simple purchase agreement and the purposes were no more complex that Dahmes wanted to sell a dryer, and Rembrandt wanted to buy it. Dahmes points to the second paragraph of the agreement, which states:

> WHEREAS, Rembrandt has agreed to purchase, and Dahmes has agreed to sell and install, a Dahmes Ductless Dryer System designed to and which will achieve 9,000 pounds of water evaporation per hour (the "Dryer System") . . .

Doc. No. 53-3 at 18. Rembrandt, by contrast, argues that the purpose of the agreement was much more specific in that the dryer was to be purchased for installation at a new facility in Thompson, Iowa. Rembrandt argues that both of those facts (the dryer was for a new facility and the facility would be located in Thompson) constitute the fundamental purpose of the agreement.

Neither parties' position is clearly wrong. Rembrandt is correct that the agreement states that the dryer was to be installed at the new Thompson facility, such that the Thompson installation could understood to be fundamental to the agreement. Dahmes is correct that Rembrandt is a large egg producer with numerous facilities and that the express terms of the contract do not make it clear that Rembrandt's purpose would be frustrated if the anticipated new Thompson facility was not built. The language of the agreement does not, by itself, resolve these competing positions.

Both parties agree that I can consider extrinsic evidence to determine the purpose of the contract. *Pieper*, 390 F.3d at 1066. Rembrandt makes extensive arguments about how its business required increased production during a specific time frame at the new Thompson facility so it could make sales to Kellogg. Dahmes contends that

Rembrandt considered installing dryers at other locations to increase production, and that the new Thompson facility was merely incidental to Rembrandt's actual goal of buying an additional dryer to increase production. None of the evidence offered by the parties is uncontroverted such that I can determine the purpose of the contract without weighing the evidence and making factual findings. Viewing the evidence in light of the non-moving party (Dahmes), I could find that the installation of the dryer at the new Thompson facility was not a primary purpose of the contract. Because there is a genuine factual dispute about the purpose of the agreement, this issue is not ripe for summary ruling.

More importantly, even if I could determine the purpose of the agreement in a summary fashion, the remaining factors clearly present contested factual issues. Whether the purpose of the contract was frustrated is in dispute. Dahmes correctly points out that the facts of this case are significantly different from those at issue in the cases Rembrandt has cited. In the factually most analogous case, *Pieper*, the contract in dispute was for the purchase of hogs. The agreement in that case articulated what would cause a frustration of purpose. The defendant agreed to buy piglets from Pieper, to be raised by a third party, and then marketed and sold per the terms of an existing agreement to another company (Farmland). The contract stated, "LOLFF will purchase such pigs from [Pieper] only while its Customers have the ability to market such pigs utilizing the Farmland America's Best Pork Marketing Agreement No. 8073 dated November 14, 2000 and originally assigned to Pieper, Inc." *Pieper*, 390 F.3d at 1064. When the third party could not sell hogs utilizing Farmland's agreement, the court was able to determine the express purpose of the contract, as described in the contract itself, and find that the purpose had been frustrated. *Id*. at 1066.

Similarly, in *Orix* the agreement at issue stated that its purpose was to provide a municipality with funding to help secure a federal grant. *Orix,* 2013 WL 6328865, at

*13.   When it became clear that the municipality could not get the grant, the explicit purpose was frustrated.  *Id*.   Finally, *Formanek* dealt with a complex agreement between a city and certain landowners, and a special assessment agreement for the city to develop the landowners' property.   Ultimately, the U.S. Army Corps of Engineers exercised discretionary authority over the property and halted development.   Based on the contract language and the undisputed intervention by the Corps of Engineers, the court was able to conclude that the contract's fundamental purpose had been frustrated.  *Formanek*, 459 N.W.2d at 174-75.

Nothing about this case is as clear cut.   Rembrandt fails to point to the specific moment that the contract's purpose was frustrated.   Was it when the outbreak of Avian Flu occurred?   Was it later, when Rembrandt's board decided not to go forward with the Thompson plant?   Was it when Kellogg decided to reduce its dependence on egg products?   Was it when Rembrandt's financing collapsed?   The cases Rembrandt relies on involved situations in which the alleged frustration was clearly defined and easily attributable to outside forces.   Here, by contrast, there is no way to resolve the "frustration" issues without making detailed factual findings.

The second element (whether the party claiming frustration of purpose is faultless) presents similar uncertainties.   Viewing the evidence most favorably to Dahmes, there are questions regarding whether Rembrandt's own actions contributed to the collapse of the agreement.   Specifically, Dahmes alleges that Rembrandt engaged in an intentionally risky expansion gambit and damaged its prospects for expanding its sales to Kellogg through bad business decisions prior to the Avian Flu outbreak.   All these allegations are supported by at least some evidence, such as Rembrandt's admissions about the risky nature of its expansion and Kellogg's statements that it had made no guarantees that it would increase its business with Rembrandt.

Finally, the third element is that "the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made." Like the purpose of the contract, the occurrence must also be understood by both parties to the contract. *See Formanek*, 459 N.W.2d at 177 ("Here, both parties testified that they would not have entered the agreement if they had known the Corps might require further permits. The non-occurrence of the Corps taking discretionary authority of the Project was a basic assumption on which the contract was made."). Rembrandt argues that successful completion of the Thompson expansion was the event assumed by both parties. However, this is a factual assertion that must be proved. I cannot find, based on either the terms of the agreement or the undisputed facts, that Dahmes had any specific expectation regarding the Thompson facility when it entered into the agreement.

For all those reasons, Rembrandt's motion for summary judgment on its request for declaratory relief will be denied.

**B.      Dahmes' Motion for Summary Judgment**

Dahmes requests summary judgment on its claims for breach of contract counterclaim. In support of its motion Dahmes notes that the contract was breached and Rembrandt's various grounds for excusing the breach.

**1.      Commercial Impracticability**

In its complaint, Rembrandt alleges that its breach is excused based on the doctrine of commercial impracticability as set out in the Uniform Commercial Code. Doc. No. 1. Dahmes makes several arguments that commercial impracticability does not apply to the present case. In response, Rembrandt states:

> Rembrandt is not relying on the doctrine of impracticability to excuse its performance under the Agreement under UCC § 2-615. Consequently, it is unnecessary to address Dahmes' mistaken argument that § 2-615 only

excuses sellers from performance. *See Melford Olsen Honey, Inc. v. Adee*, 452 F.3d 956, 954 (8th Cir. 2006) (under Minnesota UCC, commercial impracticability excuses both parties' performance).

Doc. No. 69 at 4 n.2. Accordingly, I need not consider this issue.


### 2. Force Majeure

#### a. Dahmes' Argument

Dahmes argues that force majeure supersedes any other claims Rembrandt may raise to excuse the breach:

> Force majeure is [Rembrandt's] exclusive remedy because it is the negotiation clause to allocate risk between the parties. When parties negotiate and include a force majeure clause in a contract, that clause supplants the UCC § 2–615's gap-filling provision and the common law frustration of purpose doctrine to specifically allocate the risk of certain events occurring to excuse performance. *See, e.g., Perlman v. Pioneer Ltd. Partnership*, 918 F.2d 1244, 1248 (5th Cir. 1990) ("The language in the force majeure clause . . . is unambiguous and its terms were specifically bargained for by both parties. Therefore, the [common law] 'doctrine' of force majeure should not supersede the specific terms bargained for in the contract."); *Commonwealth Edison Co. v. Allied-Gen. Nuclear Servs.*, 731 F. Supp. 850 855-56, (N.D. Ill. 1990) (finding that because the parties "deal[t] with the question of regulatory force majeure with considerable specificity. . . it is the contract, rather than a body of judicial doctrine, [the court] must interpret.").

Doc. No. 54-8 at 15. Dahmes then states:

> The concept that a party may not negotiate for an express force majeure clause and then rely on the common law for a remedy is similar to the idea that an express contract and an implied contract cannot coexist as to the same subject matter. *E.g., EAD Control Sys., LLC v. Besser Co. USA*, C 11-4029-MWB, 2012 WL 2357572 at *3 (N.D. Iowa June 19, 2012) (citations omitted). The Court reasoned, "When parties enter into a contract they assume certain risks with an expectation of a return. [When that return fails], they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasicontract for recovery.

19

> This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract." *Id.* at *4.

*Id.* at 16-17. Dahmes then goes on to argue that Rembrandt has waived any force majeure claim. Rembrandt does not dispute this point. Doc. No. 69 at 14-15. Rather, Rembrandt argues that the force majeure clause has nothing to do with the present dispute.

### b. Rembrandt's Argument

Rembrandt states:

> Dahmes' contends that the Force Majeure Clause in the Agreement "supplants . . . the common law frustration of purpose doctrine to specifically allocate the risk of certain events occurring to excuse performance." (Doc. 55-1 at 15.) However, none of the authorities that Dahmes relies on actually support that proposition. Furthermore, this argument is refuted by the language of the clause itself, which relates exclusively to the possibility that it would become impractical for Dahmes to build the dryer—not that Rembrandt's purpose in buying it would be frustrated.

Doc. No. 69 at 12. Rembrandt then argues that Dahmes has confused the meaning of force majeure:

> According to Dahmes' own cited cases and secondary sources, "force majeure" is a "contractual synonym for the general common law doctrine of (physical) impossibility . . . [that provides] an excuse for nonperformance due to impossibility to perform." . . . Thus, a force majeure clause in contract only "supersedes" "the common law doctrine of impossibility (today often called impracticability)." *Commonwealth Edison*, 731 F. Supp. at 855.

> Moreover, by its express terms, the UCC is supplemented by common law. *See* Minn. Stat. § 336.1-103(b) ("Unless displaced by the particular provisions of the Uniform Commercial Code, the principals of law and equity ... supplement its provisions.") Consequently, courts apply the common law doctrine of frustration of purpose even to contracts

20

involving the sale of goods. *See, e.g., Pieper*, 390 F.3d at 1066 (applying common law doctrine of frustration to contract involving sale of pigs) . . .

> [T]he doctrine of frustration of purpose is a separate doctrine from that of impracticality/impossibility. Section 2-615 of the UCC and the doctrine of impossibility excuse a party when that party's performance becomes impracticable; the common law doctrine of frustration excuses one party's performance when the other party's performance becomes unexpectedly worthless due to an unexpected supervening event. The doctrine of frustration will thus excuse the performance of a buyer like Rembrandt, even if the buyer is able to pay, "[i]f an event occurs which renders goods to be purchased worthless to the buyer." (Doc. 55-1 at 20.)

> None the cases relied upon by Dahmes hold that that a force majeure clause is even relevant to the availability of the common law doctrine of frustration, let alone that the clause generally "supplants" the doctrine. *See Perlman*, 918 F.2d at 1248 (holding that the doctrine of force majeure did not excuse nonperformance; frustration not at issue); *Commonwealth Edison*, 731 F. Supp. at 855 (holding that the doctrine of impossibility did not excuse nonperformance; frustration not at issue); *Eastern Air Lines v. McDonnell Douglas Corp.*, 532 F.2d 957, 990-91 (5th Cir. 1976) (holding that contractual "excusable delay clause" was "duplicative of [UCC] section 2-615"; frustration not at issue).

*Id*. at 12-14.

Finally, Rembrandt argues that by its terms, the force majeure clause does not apply to Rembrandt's breach:

> The language of the Force Majeure Clause in the Agreement, and the parties' negotiation of the clause, make plain that it was intended solely to allocate the risk that it would become impracticable for Dahmes to build and install the dryer in the Thompson facility. It is telling that Dahmes never refers to the language of the Force Majeure Clause. (See Doc. 55-1 at 17 (stating only that the "Agreement contained a negotiated force majeure clause").)

*Id*. at 15.

The force majeure clause states:

Force Majeure. Neither party shall be liable to the other for failure or delay in performance of the Work caused by war, riots, insurrections, proclamations, floods, fires, explosions, acts of any governmental body, terrorism, or other similar events beyond the reasonable control and without the fault of such party ("Force Majeure Event"). Nevertheless, such party shall use its best efforts to mitigate the effect and to perform in spite of the difficulties causing such failure or delay and shall resume performance with the utmost dispatch as soon as the cessation of the Force Majeure Event permits. Any party claiming force majeure shall give prompt written notice thereof to the other party. Notwithstanding the foregoing or any other provision of this Agreement, if either party is unable to resume performance within ninety (90) days after commencement of a Force Majeure Event, then the other party shall have the right to immediately terminate this Agreement with all available insurance proceeds to be held in a separate account by the policy insured as a fiduciary which will distribute the proceeds between the parties in an equitable fashion.

Doc. No. 53-3 at 28. Regarding "the Work," the agreement states:

Dahmes will provide all of the design, manufacture, supply, engineering, material, equipment, fabrication and installation (including providing necessary tools, supervisions and labor therefor) necessary to engineer, fabricate, deliver, install and commission the Dryer System in accordance with the requirements of this Agreement, including the Dahmes's Proposal #5244.2 (less Option 5.1 for the Indirect Heater) ("Proposal"), dated November 5. 2014, a copy of which is attached and identified as Exhibit "A" (collectively the "Work"). Such installation shall occur at Rembrandt's location in Thompson, Iowa (the "Site").

*Id*. at 18. Based on this language, Rembrandt argues:

By its terms, this provision does not apply to Rembrandt's performance, which is limited to the payment of money, as Dahmes itself points out. (See Doc. 55-1 at 20.) As Dahmes also admits, Rembrandt never asserted the force majeure provision. (See id. at 17.) To be clear, Rembrandt does not contend that its performance (paying for the dryer) became impossible. Rather, as was the case in Orix, Pieper and Formanek, Rembrandt contends that its obligation to buy the Dahmes dryer is excused because, the Thompson processing facility could not be built as a result of the HPAI outbreak, and therefore the dryer no longer has any value to

Rembrandt. There is simply nothing in the force majeure clause––which repeatedly references to "difficulties" in performance and being "unable" to perform––that supports Dahmes' argument that the parties intended this clause to allocate the risk that an unforeseen event such as the HPAI outbreak would prevent construction of the Thompson facility and render the dryer useless.

The parties' negotiations over the Force Majeure Clause further reinforce the inference that the parties intended the clause solely to relate to the situation where Dahmes could not perform. Indeed, Dahmes itself initially proposed force majeure language that expressly applied only "[i]f causes beyond Dahmes's control delay" the installation of the dryer. (See Doc. 54-1 ¶ 72.) As Dahmes admits, the focus of the negotiations was whether the clause would "include delays caused by wind and tornado" among the excuses available to Dahmes. (See id. ¶ 73-74.)

At best, the Force Majeure Clause would preclude the defense of impracticability that Rembrandt is not relying upon. Accordingly, the Court should reject Dahmes' novel and unsupported theory that the clause "supplants" Rembrandt's separate defense of frustration of purpose.

Doc. No. 69 at 16-17.


### c.    *Analysis*

Dahmes asserts two arguments in favor of its motion for summary judgment: (1) the agreement's force majeure clause applies to Rembrandt's breach of the agreement; and (2) the force majeure clause supersedes any common law remedies such as frustration of purpose.   Neither argument is well-grounded in facts or law.

With regard to Dahmes' argument that the force majeure clause must control, the express language of that clause demonstrates that it does not apply to the events at issue here.   As noted above, the clause addresses a "failure or delay in performance of the Work caused by war, riots, insurrections, proclamations, floods, fires, explosions, acts of any governmental body, terrorism, or other similar events beyond the reasonable

control and without the fault of such party." Doc. No. 53-3 at 28. The phrase "the Work" is defined to mean Dahmes' efforts in building, delivering and installing the dryer. *Id*. at 18. Thus, the clause applies to a failure or delay in the performance of Dahmes' obligations under the contract.

No such failure or delay occurred here. Dahmes' work progressed as planned until Rembrandt directed Dahmes to discontinue work because Rembrandt decided to scuttle its Thompson construction project. This was not a force majeure event, as defined in the contract. Nor does any language in the force majeure clause suggest that it was written to apply if one party to the contract makes a unilateral decision to terminate performance of the contract for market-based reasons. Accordingly, Dahmes' claim that the force majeure clause applies to this situation fails.

Dahmes has also failed to make a compelling argument that the force majeure clause restricts Rembrandt's ability to rely on the doctrine of frustration of purpose. At the outset, it is worth noting that Dahmes failed to cite any case holding that a force majeure clause precludes a frustration of purpose claim. Instead, Dahmes cites a number of cases that vaguely discuss force majeure in the context of other possible breach of contract remedies. For example, in its reply brief (Doc. No. 71) Dahmes cites *First Data Res., Inc. v. Int'l Gateway Exch., LLC*, No. 8:03CV137, 2004 WL 2187566, at *9 (D. Neb. Sept. 28, 2004), a case that discusses both force majeure and frustration of purpose. In general, two companies had a plan to distribute prepaid credit cards with Western Union serving as a third party vendor at which card purchasers could "load" their cards with money. The contract had a broad force majeure clause:

> If performance by either party of any service or obligation under this Agreement, including Conversion or Deconversion, is prevented, restricted, delayed or interfered with by reason of labor disputes, strikes, acts of God, floods, lightning, severe weather, shortages of materials, rationing, utility or communication failures, failure of a Network, failure or delay in receiving electronic data, earthquakes, war, acts of terrorist,

revolution, civil commotion, acts of public enemies, blockade, embargo, or any law, order, proclamation, regulation, ordinance, demand or requirement having legal effect of any government or any judicial authority or representative of any such government, or any other act, omission or cause whatsoever, whether similar or dissimilar to those referred to in this clause. . .

*First Data*, 2004 WL 2187566, at *3. Western Union failed to perform its function as a third party agent, causing the agreement to fall apart. The court found:

IGE has established that its performance should be excused under either section 14.9 or the business necessity defense. IGE has shown that the conduct of Western Union in handling the CashCards frustrated the essential purpose of IGE's business and, consequently, of the service agreement. IGE has shown that Western Union's actions were beyond the contemplation or control of IGE. . . Moreover, the situation fits squarely within the contemplation of the "force majeure" clause. The broad language of the clause as well as the circumstances of the case show that IGE did not assume the allocation of any risk, via the force majeure clause, that would constrain or negate the applicability of the business necessity defense. *Cf. United States v. Winstar Corp.*, 518 U.S. 839, 909, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

*Id*. at *8. In no way does the *First Data* court's analysis support Dahmes' argument. Rather, the case seemingly supports the proposition that a force majeure clause and a common law remedy can be complementary.

Another case cited by Dahmes, *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 (5th Cir. 1990), involved a voided lease with a narrow force majeure clause. The Fifth Circuit held that the district could erred by applying the common law force majeure doctrine rather than the force majeure clause set forth in the contract. *Id*. The facts of *Perlman* are not analogous to those present here because, as discussed above, no party to this case is actually claiming a force majeure situation. In *Commonwealth Edison Co. v. Allied-Gen. Nuclear Servs.*, 731 F. Supp. 850, 856 (N.D. Ill. 1990), another case cited by Dahmes, the court pointed that a boilerplate force majeure clause should be interpreted

in light of the common law doctrine while a specifically-negotiated force majeure clause should be interpreted using contract principals.

In *EAD Control Sys., LLC v. Besser Co. USA*, 2012 WL 2357572, at \*3 (N.D. Iowa 2012), another case cited by Dahmes, this court applied Iowa case law that bars an unjust enrichment claim when the parties have an express contract. Again, that case fails to support Dahmes argument that under Minnesota law, an inapplicable force majeure clause precludes a frustration of purpose of claim.

However, one case cited by both parties, *Pieper*, is on point, as it applied Minnesota law to a contract dispute with both a force majeure clause and a claim for frustration of purpose. In *Pieper*, the contract had a force majeure clause similar to this case:

> FORCE MAJEURE. Either party in this Agreement shall be suspended of their responsibilities and obligations thereunder when performance becomes commercially impossible because of reasons beyond their reasonable control such as but not limited to fire, explosion, government regulation or intervention or Acts of God. If such suspension is of a material obligation and lasts or is estimated to last for more than three (3) months, the non-suspending party may terminate this Agreement. . .

*Pieper, Inc. v. Land O'Lakes Farmland Feed, LLC*, C02-90083-RP, Doc. No. 1 (S.D. Iowa 2000). The district court entered summary judgment in favor of the buyer on its affirmative defense of frustration of purpose (*Id*. at Doc. No. 77) and the Eighth Circuit affirmed. *Pieper*, 390 F.3d at 1066. The court made no mention of any alleged conflict or inconsistency between the force majeure clause and the frustration of purpose doctrine. This situation is similar. While the contract contains a force majeure clause, no authority suggests that the existence of such a clause precludes the doctrine of frustration of purpose. As such, Rembrandt is not barred from attempting to prove frustration of purpose at trial. Dahmes' motion for summary judgment on this issue will be denied.

## C.    Other Issues

### 1.    Dahmes' Motion Regarding Accounting

In its complaint, Rembrandt's third count seeks an accounting of Dahmes' expenses to determine what portion of Rembrandt's payments Dahmes is entitled to keep. Doc. No. 1 at 4.    In its brief, Dahmes argues that it is entitled to summary judgment on Rembrandt's accounting claim because it has provided an accounting.    Doc. No. 54-8 at 33.    Rembrandt admits that Dahmes provided a damage estimate but alleges that the estimate is not accurate and includes unrecoverable expenses such as attorney's fees. Doc. No. 69 at 16-17.    As this is a factual dispute, summary judgment is not appropriate and the matter will be determined at trial.    Dahmes' motion for summary judgment on the accounting claim will be denied.

### 2.    Rembrandt's Motion Regarding Lost Profits

Dahmes makes a claim for lost profits.    Rembrandt moves for summary judgment on the lost profits claim, arguing that lost profits are speculative and that speculative damages are prohibited by Minnesota law.    *See Tech. Corp. v. Cisco Sys. Inc.*, 395 F.3d 921, 928 (8th Cir. 2005).    Specifically, Rembrandt states:

> Dahmes' corporate representative on the topic of its damages, Dan DeGeest, testified multiple times that estimating Dahmes' total costs in building the dryer (which was less than 15% complete when Rembrandt told Dahmes to suspend work) would require "speculation."    (SOF ¶ 71.) There is nothing in the record besides the admittedly speculative estimates that would allow the court to calculate damages, or even determine whether there would be any profits in the first place.    This "failure to produce evidence substantiating any amount of damages . . . is fatal to [Dahmes'] claim," and Rembrandt is therefore entitled to summary judgment.    *See Storage Tech.*, 395 F.3d at 928.

Doc. No. 53-1 at 19.    Dahmes responds:

Minnesota Code § 336.2–708(2) provides one "measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer." "The law does not require mathematical precision in the proof of loss but only proof to a reasonable, although not necessarily absolute, certainty." *Unique Sys., Inc. v. Zotos Intern., Inc.*, 622 F.2d 373, 378 (8th Cir. 1980). Dahmes reasonably attempted to quantify its damages after the breach occurred. Such damages need not be established with "mathematical precision in the proof of loss but only proof to a reasonable, although not necessarily absolute, certainty." *Unique Sys., Inc.*, 622 F.2d at 378. Dahmes's project estimates were based on its labor costs, its learned experience on similar projects, and on updated information about materials pricing which it used to make an informed business decision when submitting its bid to Rembrandt for the dryer.

Doc. No. 70 at 20-21.

Although I am inclined to agree with Rembrandt that Dahmes' claim for lost profits is inherently speculative – and thus barred by Minnesota law – I will find it appropriate to deny the request for summary judgment on this issue and reserve ruling until I have had the opportunity to hear the evidence at trial.

### 3.     *Rembrandt's Motion Regarding the Confidentiality Claim*

Finally, as noted above, Dahmes asserts a counterclaim alleging that Rembrandt breached the parties' agreement by attaching exhibits A and D to the complaint in this case. *See* Doc. No. 14 at 13-14, referencing Doc. No. 1. Dahmes contends that the agreement contained provisions to keep financial information confidential and that Rembrandt breached that agreement by including the exhibits with the complaint. *Id.*

Rembrandt moves to summarily dismiss that claim, arguing that the exhibits attached to the complaint were not covered by the confidentiality provisions of the agreement and, even if they were, Dahmes cannot prove any damages. Dahmes has not resisted Rembrandt's motion on this issue. *See* Doc. No. 70. Accordingly, for the

reasons set forth by Rembrandt, Rembrandt's motion for summary judgment regarding Dahmes' confidentiality/breach of contract counterclaim will be granted.

## VI.  CONCLUSION

For the reasons set forth herein:

1.     Rembrandt's motion for summary judgment (Doc. No. 53) is **granted in part** and **denied in part**.   The motion is **granted** with regard to Dahmes' breach of contract/confidentiality counterclaim and is **denied** in all other respects.

2.     Dahmes motion for summary judgment (Doc. No. 54) is **denied** in all respects.

3.     This case will proceed to trial as scheduled beginning September 18, 2017.

**IT IS SO ORDERED.**

**DATED** this 7th day of September, 2017.

_____
Leonard T. Strand, Chief Judge